MONARCH MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19418. Promulgated October 10, 1950.

*Benjamin Poss, Esq., Howard Schuler, Esq.,* and *Louis L. Meldman, Esq.,* for the petitioner.

*Harold H. Hart, Esq.,* and *Richard L. Greene, Esq.,* for the respondent.

### OPINION.

Turner, *Judge:* The petitioner concedes the correctness of respondent's determination of its excess profits tax computed without the

benefit of section 722 of the Internal Revenue Code, but contends that the tax so computed is excessive and discriminatory if section 722 (b) (2) [1] of the Code be applied.

It is to be noted that petitioner in reporting and paying its excess profits tax for the years here in question computed its excess profits credit on the basis of invested capital, its average base period net income being zero, and that respondent in his determination of the deficiency, the correctness of which has not been contested by the petitioner, determined and allowed on the basis of invested capital an excess profits credit of $49,411.69 for the year ended January 31, 1942, and $59,131.50 for the taxable year ended January 31, 1943. It is necessary, therefore, that the petitioner show that its excess profits tax so computed was excessive and discriminatory [2] and, since its claim that the tax was excessive and discriminatory is made under section 722 (b) (2), it must show that its average base period net income was an inadequate standard of normal earnings because its business was depressed in the base period due to temporary economic circumstances unusual to it. In other words petitioner not only must show that its business was depressed by temporary economic circumstances unusual to it but it must also show that the constructive average base period net income which would have been normal in the absence of such temporary economic circumstances will result in an excess profits credit greater than that computed on the basis of invested capital and allowed by the respondent.

That petitioner's average base period net income did not represent normal average net income if we accept petitioner's premises that its average actual earnings for the years 1919 to 1928 would have been

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\* \* \* \* \* \*

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. \* \* \*

its normal earnings in the base period but for the economic circumstances complained of is, of course, obvious. The same might also be said if we should regard the average earnings for the entire period from 1919 up to the base period years as normal earnings which might have been expected but for the said circumstances. That alone, however, does not supply the necessary basis for the relief sought. It must further appear that the inadequacy of petitioner's average base period net income was due to the depression of its business in the base period because of temporary economic circumstances unusual to it.

From its inception the petitioner adopted a policy of limiting its sales of outer wear to wholesalers and jobbers, the only exception being sales to Sears, Roebuck & Co. and Montgomery Ward & Co. Whereas, some of its competitors adopted the policy of selling direct to retailers as well as wholesalers petitioner adhered to its policy of selling only to wholesalers and jobbers, exclusive of the two firms mentioned, and until the general change in merchandising came about it reaped the benefits of that policy. The expense and effort of selling its products were reduced to a minimum and so far as appears from the record its operations were substantially limited to the problems of designing and manufacturing its product. It needed only three salesmen and they could sell petitioner's entire output in approximately eight weeks. Its advertising costs ran from $1,000 to $2,000 per year.

With the advent of the chain stores and the development and construction of modern highways the merchandising picture as between manufacturer and consumer changed materially. The chain stores could buy in quantities directly from the manufacturers as well as could a wholesaler or jobber and by elimination of the middleman's profit could price their merchandise at prices much more attractive to the consumer. The same thing was true and no doubt had been true previously in the case of the larger stores in the larger centers. The business of the wholesalers is shown by the record to have been to a substantial degree with stores in rural and outlying areas and in the small communities and towns. With the building of modern highways and by the use of their automobiles rural and small town or community consumers could travel with comparative ease to the larger centers and buy from stores where they could have the advantage of a wider selection of goods and through the lower prices at which the goods were offered could participate with the retailers in the profits which had theretofore gone to wholesalers and jobbers. As a result many rural and small town stores either went out of business or eliminated certain lines of merchandise on which they were at great competitive disadvantage with the chain stores and the stores in the larger centers. With this elimination or drying up of substantial outlets of jobbers and wholesalers a change in petitioner's

method and policy of merchandising was inevitable. It either had to establish its goods as such in the minds of the retailers and consumers so that there would be ample demand therefor even though it continued to depend upon wholesalers and jobbers as its immediate customers or it had to change its policy from selling only to wholesalers and jobbers, exclusive of Sears, Roebuck and Montgomery Ward, and solicit and build a market with the retailers. To that end petitioner as early as 1927 expended $28,728.32 as compared with $1,000 to $2,000 in previous years on advertising in trade journals directed to retailers in an effort to build up a demand for its own goods as such. As a result it encountered resistance to such a program from its wholesaler and jobber customers and with its sales at that time still continuing at a very high level it yielded to that pressure and continued with its old selling policy.

With the coming of the stock and securities market crash in 1929 and the general business depression which followed, the change in the method of manufacturer selling and consumer buying was hastened. Some of the wholesalers and jobbers who had regularly bought petitioner's goods were going out of business and the purchases of those remaining were in greatly reduced quantities. It was necessary, therefore, for petitioner, if it was to survive, to completely revise and overhaul its selling methods and policies. Beginning with 1931 it made its first sales to retailers, exclusive of Sears, Roebuck and Montgomery Ward.

It employed and trained a corps of salesmen and actively entered into competitive selling to retailers as contrasted with its prior policy of selling for the general retail trade only through wholesalers and jobbers.

After 1931 its sales to wholesalers and jobbers were comparatively small and by January 31, 1938, they had ceased completely. In direct contrast its sales to retailers, exclusive of Sears, Roebuck and Montgomery Ward gradually and steadily increased until by 1936 such sales were approaching 50 per cent of its total gross sales.

On such facts and circumstances we are unable to conclude, as petitioner would have us do, that the circumstance which it claimed depressed its business during the base period year was a temporary one. It was an economic circumstance and a circumstance unusual in the case of the taxpayer, in that prior to the middle twenties it had never been encountered by petitioner but it was in no sense a temporary circumstance or event. It was a permanent circumstance or to put it differently a situation requiring a complete and drastic change in the method of merchandising manufactured goods. Conceivably a change in methods of merchandising such as we have here might have justified consideration of the applicability of section 722 (b) (4)

where subject to certain conditions and requirements relief is allowed in a case in which there has been a change in the character of a taxpayer's business during or immediately prior to the base period. Petitioner has not predicated his claim on section 722 (b) (4), however, but on section 722 (b) (2) and in that section there is no provision for relief where, as in the case here, the circumstance is not temporary but definite, final, and permanent. See and compare *El Campo Rice Milling Co.*, 13 T. C. 775; *Lamar Creamery Co.*, 8 T. C. 928; and *The Fish Net & Twine Co.*, 8 T. C. 96.

But even though it be assumed in petitioner's favor that the circumstances necessitating the change in its policy and practice of selling its output from wholesalers and jobbers to retailers were temporary economic circumstances unusual in petitioner's case we would still be obliged to hold for the respondent for the reason that petitioner has failed to establish what would be a fair and just amount representing normal earnings for the base period years but for the economic circumstances in question, or that the constructive average base period net income derived therefrom would have supplied an excess profits credit for either taxable year in excess of the excess profits credit which has been determined and allowed on the basis of invested capital. In the first place, by mere assertion and without factual showing or demonstration petitioner claims that but for the circumstances necessitating a change of customers from wholesalers to retailers its normal base period sales to retailers—exclusive of Sears, Roebuck and Montgomery Ward—would have borne the same ratio to the sales to those two companies in the base period years as the sales to wholesalers and jobbers in 1919 to 1928, both inclusive, bore to the sales in those years to Sears, Roebuck and Montgomery Ward. And second, it has similarly assumed without proof or demonstration that the margin of profit which would have been normal for the base period years would have been the same as its margin of profit for the 1919 to 1928 period. For the purpose of corroborating its claim that its gross sales and profits for the period 1919 to 1928, inclusive, would have been normal for the base period years it placed in evidence over respondent's objection a table showing its sales during the war years and up to and including 1948 and its profits derived therefrom. In the table in question the sales for each year were broken down to show the sales to Sears, Roebuck and Montgomery Ward, the sales to retailers other than the two companies named, the sales direct to the Government and sundry sales.

We know very little about petitioner's operations during the base period except the bare facts as to its gross sales, the portions thereof made to wholesalers and jobbers, the sales to Sears, Roebuck and Montgomery Ward, and the sales made to retailers other than those two companies and the amount of net income or loss for each year.

Petitioner has given us no facts as to the general state of the outer wear business for the base period as compared with the period from 1919 to 1928, the period which it desires us to accept as a normal comparative for the base period. As to the 1919 to 1928 period, we do know that it was decidedly a peak period for petitioner. There is testimony that at or shortly after World War I petitioner was a leader in the outer wear manufacturing field but we know nothing of its position in that field during the base period years. We do not know to what extent sales for the entire industry were up or down in the base period as compared with the 1919 to 1928 period. We do not know whether petitioner retained its relative portion of the business and if not to what extent its business was relatively more or less. Neither do we know whether the purchases by Sears, Roebuck and Montgomery Ward, the sales around which petitioner bases its computation of constructive average base period earnings, were relatively the same in the base period years or relatively up or down. In short, we have no facts from which we may reasonably conclude that petitioner's sales to retailers in the base period would have exceeded actual sales even if it had regularly sold to retailers throughout its entire existence.

In justification of its assumption that its operations for the period from 1919 to 1928 were indicative of what would have been normal in the base period petitioner points to the results of its operations for the war years and the years following, up to and including 1948. Even assuming that proof of operations for such years is admissible for that purpose under *Dyer Engineering, Inc.*, 10 T. C. 1265, and *Wisconsin Farmer Co.*, 14 T. C. 1021, it is sufficient here to say that the bare statement of gross sales and net income for the war and post war years, with the gross sales broken down into sales to retailers exclusive of Sears, Roebuck and Montgomery Ward, sales direct to the Government, sales to Sears, Roebuck and Montgomery Ward and sundry sales is wholly inadequate to substantiate or corroborate any claim as to what would have been normal for the base period years. Business and economic conditions existing in the base period and in prior years were drastically different from those conditions for the war and post war years, and for the purposes of comparison in deciding a question such as we have here more is required than a mere showing of a dollars and cents result.

Finally, in establishing its claimed constructive average base period earnings the petitioner without proof as to soundness or demonstrated justification assumes an earnings factor of 5.823 cents for each dollar of its claimed reconstructed base period gross sales. The only basis for the use of such factor is that it represents petitioner's earnings factor for 1919 to 1928, inclusive. No proof whatever is offered to show

that such an earnings factor was normal for the industry in the base period. In fact petitioner has offered no proof at all with respect to the operating results of the industry as a whole for the base period or any other period, and in that connection it may be stated that petitioner makes no claim that the operations of the outer wear industry as a whole during the base period was not normal. With respect to the earnings factor of 5.823 cents it may also be noted that it represented the profit per dollar of gross sales by petitioner during its peak of operations and, further, that its sales during that period were chiefly to jobbers and wholesalers and its selling costs were comparatively very small. It had only three salesmen and they needed only 8 weeks to sell petitioner's annual output. Its advertising costs ranged from $1,000 to $2,000 per year. We have no evidence as to what would have been the normal selling costs for the base period as compared with the actual selling costs for 1919 to 1928 used in computing the earnings factor of 5.823 cents, but we do know that in selling to retailers as distinguished from selling to wholesalers it was necessary for petitioner to employ and train a substantially larger group of salesmen and there is some indication of record that normal advertising costs were substantially greater.

Such being the state of the record, we have no way of knowing what a fair amount would be for use as petitioner's constructive average base period net income for the purpose of determining the applicability of section 722 of the Code. It follows, therefore, that petitioner has not established its right to the use of an excess profits credit for either taxable year in excess of the excess profits credit which has been determined and allowed on the basis of invested capital and the respondent must be sustained in his disallowance of the petitioner's claims. See and compare *Trunz, Inc.*, 15 T. C. No. 15; *Stonhard Co.*, 13 T. C. 790; *Kartsen Catering Co.*, 13 T. C. 645; and *Irwin B. Schwabe Co.*, 12 T. C. 606.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

