*Decisions will be entered under Rule 50.*

THE D. L. AULD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20198.    Promulgated January 22, 1952.

`Carl Tangeman, Esq.*, and *John C. Elam, Esq.*, for the petitioner. *Lester M. Ponder, Esq.*, for the respondent.

1202

**OPINION.**

VAN FOSSAN, *Judge:* The only issue present in this proceeding is whether or not the petitioner is entitled to excess profits tax relief

under section 722 (b) (1) of the Internal Revenue Code.[1] The petitioner corporation sustained a loss in each of the fiscal years ending in June of 1937, 1938, 1939, and 1940 which constitute the statutory base period.[2] The average base period net income being zero, the corporation, which had existed since 1906, elected to compute its excess profits credit based on invested capital.[3] The excess profits credits so computed were $38,902.10, $46,550.44, and $45,633.21 for the fiscal years ending on June 30, 1941, 1942, and 1943, respectively. It is petitioner's contention that the excess profits tax computed without the benefit of section 722 (b) (1) is excessive and discriminatory. To qualify under section 722 (b) (1) the petitioner must demonstrate that because of the strike in October 1936 the average base period

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earning to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer.

[2] SEC. 713. EXCESS PROFITS CREDIT—BASED ON INCOME.

\* \* \* \* \* \* \*

(b) BASE PERIOD.—

(1) DEFINITION.—As used in this section the term "base period."—

(A) If the corporation was in existence during the whole of the forty-eight months preceding the beginning of its first taxable year under this subchapter, means the period commencing with the beginning of its first taxable year beginning after December 31, 1935, and ending with the close of its last taxable year beginning before January 1, 1940; and

\* \* \* \* \* \* \*

[3] SEC. 712. EXCESS PROFITS CREDIT—ALLOWANCE.

(a) DOMESTIC CORPORATIONS.—In the case of a domestic corporation which was in existence before January 1, 1940, the excess profits credit for any taxable year shall be an amount computed under section 713 or section 714, whichever amount results in the lesser tax under this subchapter for the taxable year for which the tax under this subchapter is being computed. In the case of all other domestic corporations the excess profits credit for any taxable year shall be an amount computed under section 714. \* \* \*

SEC. 714. EXCESS PROFITS CREDIT—BASED ON INVESTED CAPITAL.

The excess profits credit, for any taxable year, computed under this section, shall be the amount shown in the following table:

\* \* \* \* \* \* \*

net income is an inadequate standard of normal earnings. *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220. The average base period net income, however, was not the standard used by the petitioner in determining the excess profits credits and the excess profits tax. As stated above, the invested capital method was employed. In these circumstances the petitioner must, therefore, show, not only that a strike occurred which interrupted or diminished normal production, output or operation in one or more taxable years in the base period, but also that the constructive average base period net income which would have been normal in the absence of the strike will result in an excess profits credit greater than that computed on the basis of invested capital and allowed by the respondent. *Monarch Manufacturing Co.*, 15 T. C. 442. It is to be noted that section 722 (b) (1) is concerned with an unusual event interrupting or diminishing production, output or operation. The language of the statute does not refer to an event which only affects the profit-making ability of the corporation without affecting production.

The strike at the petitioner's plant occurred on October 19, 1936, within the first six months of the statutory base period. It closed the plant until November 12 of that year. The strike ended in December of the same year. The interruption of production during this short period does not automatically dictate a holding that the average base period net income which would have been earned if there had been no strike would have resulted in a greater excess profits credit than that computed on the invested capital basis.

It is the petitioner's contention that the loss of tools and dies to its competitors, the loss of trained personnel, the loss of contracts and orders with customers who feared a recurrence of the strike caused the excess profits tax to be excessive and discriminatory. The petitioner argues that the effects of the strike were sufficiently strong and enduring to decrease the average base period net income to such an extent that the excess profits credits computed by the invested capital method would be less than the excess profits credits based on the average base period net income that would have been earned had there been no strike.

The evidence shows that when the strike occurred at the Auld plant, the petitioner's automotive customers took the dies necessary to produce their parts and had them reworked to fit other equipment. The loss of these tools prevented the petitioner from continuing its production of parts for the 1937 model automobiles. There is no evidence in the record before us, however, showing the petitioner's production, operation, or output in terms of units before or after the strike. We must, therefore, employ other data to determine the effect of the strike on production.

At the time of the strike petitioner employed approximately 400 persons. In November of 1936, before the strike was called off, over 200 employees returned to work. In February of 1937 the full complement of over 400 employees was at work. Though some of these workers may have been newly employed, untrained personnel, the figures approximate the number of employees at work prior to the strike. Throughout the remainder of 1937 an average of more than 300 employees was carried on the payroll. The number of workers declined in 1938 but increased again in 1939 and 1940. Examination of these data does not indicate a serious interruption or diminution of production or operation because of the 1936 strike.

The production of trim parts and hub caps is partially reflected in net sales figures because the constantly changing automobile and appliance designs require the majority of such parts to be sold while still in style. Some parts are, of course, used as replacements. Net sales of the Auld Company indicate that the years 1926 through 1931 were relatively the strongest in terms of sales in petitioner's experience but that sales declined sharply in 1932 and continued at a lower level through 1935. In 1936 sales increased again but dropped off during the next three years. In 1940 net sales again rose to the level of the 1926–1931 period. Production and net sales decreased in the base period years ending in June 1937, 1938, and 1939, and attained a high level again in the year ending June 1940. Since we are concerned with the average base period net income that the petitioner would have received had there been no strike, we must examine this decline in production and sales against the background of automobile production which was the source of 80 per cent of the petitioner's business.

During the first year of the base period, mid-1936 to mid-1937, the petitioner's net sales and cash receipts from automotive customers decreased by more than $500,000 from the prior year, whereas automobile production for the model year 1937 increased by over 500,000 cars. It was in this period that the strike occurred. During the following year net sales dropped only $113,706 and cash receipts from automotive customers increased by more than $11,000. Automobile production, however, was down almost half of the total for the previous year. In fiscal 1939 net sales decreased slightly as did cash receipts for the model year. At the same time, automobile production began to climb upwards. By mid-1940, automobile production had increased by approximately 700,000 cars. Petitioner's net sales increased by more than $500,000 and cash receipts from automobile manufacturers went up almost $500,000 over the previous year.

It can be seen from these figures that the petitioner suffered a sharp decline in production and sales in the fiscal year ending in 1937. It will not be gainsaid that this year was seriously affected by the strike and it can be accurately said that the strike interrupted

and diminished the production and operation of the corporation in that year. The fact that a cash dividend was declared during the year ending in 1937 is not particularly persuasive of a different conclusion. In the fiscal year ending in 1938, however, automobile production decreased by almost half of the previous year's total. At the same time petitioner's cash receipts from automotive customers increased. It thus appears that whatever the effect of the strike in the year 1936–1937 little effect was felt in 1937–1938.

During the next two fiscal and model years the petitioner's net sales and cash receipts followed the general trend of automobile production and by the close of June 1940 the petitioner had secured a net sales and cash receipts position approximately equal to that of fiscal 1936. Automobile production for 1939–1940 had similarly nearly attained the 1936 level. It becomes apparent from this examination that the effects of the strike were felt during one fiscal year but that corporate production and operation thereafter attained a level which can only be called normal under the circumstances. The effects of the strike were not strong enough to affect seriously petitioner's production or operation in the years after June 1937.

A similar conclusion is reached when the statements of petitioner's officers at stockholders and directors meetings during the period in question are examined. Before the strike it was noted that the Auld Company was securing very little hub cap business which had previously accounted for 50 per cent of the petitioner's volume. In 1938 a general slump in business was noted. This observation tallies with the examination of automobile production for that year. Also, in 1938 the corporate officers were told that low sales would continue while customers maintained reduced or suspended operations. Competition, with very low prices, was blamed for taking away business. In 1939 and 1940 the corporate officers reported increased sales but no corresponding increase in profit. These reports coincide with the facts revealed by the data on net sales, cash receipts and automobile production.

The figures on gross profits, taxable net income and excess profits income indicate that the losses sustained during the base period years were reduced in each year of that period. The decline in total assets and accumulated earnings and the increase in notes payable evidence an unsatisfactory financial condition during the base period, but there is no proof that this situation resulted from the strike of October 1936. Income, asset, and profit figures reflect other elements besides corporate production and operation, and the loss of profits may well have been due to factors such as competition and decreased automobile production which are not within the scope of section 722 (b) (1). *Harlan Bourbon & Wine Co.*, 14 T. C. 97. One fact

that may have affected petitioner's production was the acquisition by General Motors of subsidiaries to produce hub caps and trim parts. The ownership of a plant to make these parts would reduce this automotive manufacturer's demand for the petitioner's products.

We conclude that section 722 (b) (1) is unavailable. We so conclude because the petitioner has failed to sustain its burden of showing that, because of the existence of the brief interruption and diminution, the excess profits credit computed and allowed on the basis of invested capital was inadequate. The effects in the later years of the strike were not sufficiently evidenced to lead us to the conclusion that the corporation would have attained a higher excess profits credit based upon the average base period net income reconstructed as if no strike had occurred. Albeit any computation under section 722 must be based on assumptions, such assumptions must comport with reason when associated with known facts.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*