THE MIAMI VALLEY COATED PAPER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30181. Filed May 28, 1957.

*Scott P. Crampton, Esq.*, for the petitioner.
*Lyman G. Friedman, Esq.*, for the respondent.

TIETJENS, *Judge:* This case involves refunds of excess profits tax claimed by petitioner in applications for relief under section 722 of the Internal Revenue Code of 1939 and deficiencies in excess profits tax arising from so-called standard issues for the years 1944, 1945, and 1946.

The Commissioner disallowed the claims for refund and determined deficiencies in excess profits tax as follows:

| Year ended April 30 | Deficiency |
| --- | --- |
| 1944 | $19,499.48 |
| 1945 | 3,817.10 |
| 1946 | 4,776.26 |

The petitioner claims relief under section 722 (b) (1), (2), and (4). The Commissioner contends that this Court has no jurisdiction of the (b) (4) claim and that petitioner has not qualified for relief under the other subsections.

The standard issues involve the propriety of the Commissioner's disallowance of certain claimed deductions.

### FINDINGS OF FACT.

Some of the facts are stipulated and are so found; and the stipulation of facts, together with the pertinent exhibits, is included herein by this reference.

### General and Section 722 Issues.

Petitioner is a corporation incorporated under the laws of the State of Ohio in 1925. It keeps its books and files its Federal income and excess profits tax returns on an accrual basis of accounting for fiscal years ending April 30. For all periods material hereto the returns of petitioner and its claims for refund on Treasury Department Form 843 were filed with the collector of internal revenue for the first district of Ohio at Cincinnati, Ohio.

Petitioner is engaged in the business of converting and selling coated book and specialty grade papers, with its principal place of business at Franklin, Ohio. It is known as a paper converter for business census purposes and is a member of the book paper manufacturers industry. Petitioner began the business of coating paper in 1926. It purchased uncoated base paper from manufacturers and applied coating on its own machines. At that time the large paper manufacturers prepared their coated paper by a two-step process—first, the manufacture of raw paper and, second, the actual coating of the paper. The coating process consists of the application of a very fine layer of clay or other coating material to the paper in such a way as to give it a glossy surface. With regard to coated paper the petitioner's work consisted only of the function of coating paper, or the second step in the process. Prior to 1934 petitioner had two principal classes of products, generally known as "standard paper" and "specialty paper." Specialty papers are papers made for specific purposes, for example, hectograph paper and tag paper. Standard grade papers are papers that are generally sold in large volume, such as are sold to commercial printers for general printing purposes. Standard papers include book papers and are of two types, coated and uncoated. Petitioner produced and sold only coated book papers. Petitioner's records did not segregate actual dollar sales of specialty paper and standard paper.

Competition in the coated paper industry was keen. About 1934 a process for coating paper at the same time raw paper was being made completely eliminated the secondary coating operation, so that petitioner was no longer able to compete profitably with the large integrated producers of standard grades of coated paper. This led pe-

titioner to seek specialized markets for its output and resulted in financial difficulties which culminated in petitioner's being forced into receivership in September 1936. At that time the plant had been reduced to inoperation, cars of material were on the siding, cash funds were almost nonexistent, and virtually all receivables had been assigned. The receiver immediately made arrangements to borrow money and subsequently borrowed $50,000 to provide working capital.

All during its existence petitioner has conducted its manufacturing operations in practically the same manner.

During the receivership the business continued to be managed by the man who had been president of petitioner and had been in the paper business for years. There were no important changes in personnel or equipment during the base period years though the receiver did dispense with some advertising, salesmen, and other promotional activities. Continuing effort was made to turn the business more largely to specialty coated paper for particular purposes of customers because it was felt that the future of the business lay in that direction. The receiver did a commendable job of running the business; and by May 1941, when petitioner was affected by increased business activity created by the war situation, its sales had increased to $1,200,000 or about double a normal year's operation. On November 1, 1942, the receivership was terminated and the properties of petitioner were turned back to its original owners in a little better condition than when taken over.

Petitioner's net sales for its fiscal years were for the years shown respectively as follows:

| Fiscal year | Net sales for fiscal year ended April 30 | Fiscal year | Net sales for fiscal year ended April 30 |
|---|---|---|---|
| 1927 | $719, 978 | 1935 | $538, 756 |
| 1928 | 697, 930 | 1936 | 653, 101 |
| 1929 | 976, 444 | 1937 | 654, 734 |
| 1930 | 956, 506 | 1938 | 503, 206 |
| 1931 | 661, 199 | 1939 | 529, 176 |
| 1932 | 501, 935 | 1940 | 614, 898 |
| 1933 | 425, 976 | 1941 | 606, 201 |
| 1934 | 614, 021 | | |

Petitioner's earnings as reported on its Federal income tax returns for the years ended April 30, 1928 through 1940, are as follows:

| Fiscal year ended April 30 | Net income (or loss) | Fiscal year ended April 30 | Net income (or loss) |
|---|---|---|---|
| 1928 | ($39, 533. 13) | 1935 | ($34, 725. 32) |
| 1929 | 39, 903. 25 | 1936 | (29, 242. 34) |
| 1930 | 20, 519. 80 | 1937 | 3, 155. 85 |
| 1931 | 9, 411. 26 | 1938 | (10, 412. 78) |
| 1932 | (24, 949. 36) | 1939 | (10, 680. 36) |
| 1933 | (28, 366. 60) | 1940 | (9, 079. 38) |
| 1934 | (11, 398. 65) | | |

During the fiscal years here involved petitioner was entitled to use the excess profits credit based on income pursuant to section 713. Petitioner's excess profits tax credit based on its actual "average base period net income," determined without regard to section 722, was less in each of the fiscal years involved than its excess profits tax credit based on invested capital. The Commissioner determined that petitioner was entitled to an excess profits tax credit based on invested capital for the fiscal years and in the respective amounts as follows:

| Fiscal year ended in— | Excess profits tax credit |
|---|---|
| 1941 | $18,422.79 |
| 1942 | [1] 18,332.20 |
| 1943 | 17,111.70 |
| 1944 | 17,276.50 |
| 1945 | 18,405.48 |
| 1946 | 23,622.47 |

[1] Petitioner had an unused excess profits credit carryover from the taxable year ended April 30, 1941, in the amount of $18,422.79 and an unused excess profits credit carryback from the taxable year ended April 30, 1943, in the amount of $16,685.78, which amounts are not included in the above figure.

Petitioner's excess profits net income (or loss) for each of the taxable years ended April 30, 1941 to 1946, inclusive, computed under section 711 of the Internal Revenue Code of 1939 is as follows:

| Fiscal year ended April 30 | Excess profits net income (or loss) |
|---|---|
| 1941 | ($10,485.73) |
| 1942 | [1] 78,354.47 |
| 1943 | 425.92 |
| 1944 | 97,353.67 |
| 1945 | 123,865.75 |
| 1946 | 106,308.04 |

[1] After benefit of net operating loss carryovers and carryback as follows:
Net operating loss carryover from year ended Apr. 30, 1940____ $10,186.74
Net operating loss carryover from year ended Apr. 30, 1941____ 8,158.55
Net operating loss carryback from year ended Apr. 30, 1943____ 1,963.06

Petitioner filed with the Commissioner on Treasury Department Form 991 various applications for relief from excess profits taxes under section 722 of the Internal Revenue Code of 1939 for the years, on the dates, and in the amounts respectively, as follows:

| Fiscal year ended in— | Date filed | Amount of claim | Fiscal year ended in— | Date filed | Amount of claim |
|---|---|---|---|---|---|
| 1941 | Aug. 4, 1944 | ([1]) | 1944 | Sept. 15, 1944 | $7,777.62 |
| 1941 | Aug. 8, 1952 | ([1]) | 1944 | Aug. 8, 1952 | 36,938.43 |
| 1942 | Sept. 15, 1944 | $9,184.33 | 1945 | Aug. 14, 1945 | 10,425.64 |
| 1942 | Aug. 8, 1952 | 9,184.33 | 1945 | Aug. 8, 1952 | 1,875.44 |
| 1943 | Sept. 15, 1944 | ([1]) | 1946 | July 16, 1946 | 7,285.33 |
| 1943 | Aug. 8, 1952 | ([1]) | 1946 | Aug. 8, 1952 | 3,181.02 |

[1] None.

The claims for 1941 and 1943 sought no refunds. No excess profits tax was paid for those years.

The original applications filed by petitioner were marked to indicate only that petitioner was claiming relief under subsections (b) (1), (b) (2), and (c) (3) of section 722. During the consideration of these claims petitioner submitted additional data in support of its claims, some of which might have been pertinent to a claim under subsection (b) (4) had one been made. There is no evidence of record showing that the Commissioner ever considered, or petitioner ever made, any claim under subsection (b) (4) prior to issuance of the statutory notice of deficiency and disallowance of the claims for relief issued on June 9, 1950. The notice of disallowance did not mention specifically any of the subsections of section 722.

The applications for relief filed for each year by petitioner on August 9, 1952, were marked "Amended, Supplemental and New" and these expressly indicated that petitioner was claiming relief under subsection (b) (4) and (b) (5) as well as under the other provisions previously checked. The Commissioner has refused to consider or act upon these 1952 applications for relief.

### Standard Issues.

In connection with its manufacture and sale of paper petitioner made the usual allowances in connection with its sales and granted discounts to its customers for prompt payment. It set up these reserves as an approximate percentage of its gross sales. The Commissioner determined that only the actual sales allowances and discounts may be deducted in computing the net income. The sales allowances claimed and allowed and the discounts claimed and allowed and the total differences are by years respectively as follows:

| Fiscal year ended in— | Sales allowances | | Discounts | | Total difference |
|---|---|---|---|---|---|
| | Reserve set up | Actual allowance | Reserve set up | Actual discounts | |
| 1942 | $10,181.04 | $2,745.33 | $35,213.66 | $35,363.45 | ($7,285.92) |
| 1943 | 2,500.83 | 2,935.77 | 17,463.29 | 21,412.58 | 4,384.23 |
| 1944 | 4,509.58 | 2,325.10 | 29,894.48 | 32,437.22 | 358.26 |
| 1945 | 2,667.33 | 3,994.78 | 34,554.99 | 34,957.70 | 1,730.16 |
| 1946 | 1,820.11 | 1,820.11 | 40,713.61 | 38,830.84 | (1,882.77) |
| 1947 | 1,918.71 | 1,918.71 | 62,552.58 | 60,333.03 | (2,219.55) |
| 1948 | 6,007.89 | 6,007.89 | 47,166.03 | 51,910.80 | 4,744.77 |
| 1949 | 9,730.61 | 9,730.61 | 19,223.03 | 19,898.40 | 675.37 |
| Totals | $39,336.10 | $31,478.30 | $286,781.67 | $295,144.02 | $504.55 |

In its fiscal year ended in 1943 petitioner accrued $811.75 as a reserve for factory supplies, which amount was closed to the expense account in its fiscal year ended in 1944. This closing of the reserve account had the effect of reducing its expenses for the later year by the amount of the reserve. In the deficiency notice the Commissioner disallowed the deduction of this amount in 1943.

OPINION.

## Subsection (b) (4) and (b) (5) Claims.

A claim under subsection (b) (5) was noted by petitioner in its "Amended, Supplemental and New" applications filed August 8, 1952. No argument with reference to this claim has been made on brief and we treat it as abandoned.

With reference to the subsection (b) (4) claim, the Commissioner's contention is that this Court has no jurisdiction to consider it. We agree. Our findings of fact show that prior to the issuance of the statutory notice of disallowance, the only grounds for relief specifically claimed by petitioner in its applications and related documents were under section 722 (b) (1), (b) (2), and (c) (3). (The subsection (c) (3) claim has not been pressed on brief; we consider it abandoned and will make no further reference to it.) Despite petitioner's argument to the contrary, there is nothing in the record to show that petitioner mentioned subsection (b) (4) relief or that the Commissioner ever accepted, acted on, or gave consideration to a subsection (b) (4) claim. For these reasons this case is distinguishable from cases like *Eisenstadt Manufacturing Co.*, 28 T. C. 221, where it was found that the Commissioner had waived his regulatory requirements. We hold we have no jurisdiction to consider a claim under subsection (b) (4). The attempted enlargement of the claims comes too late. No administrative action was ever taken thereon and there is nothing before us for review. See *Blum Folding Paper Box Co.*, 4 T. C. 795.

## Subsection (b) (1) and (b) (2) Claims.

Petitioner seeks relief from excess profits taxes under section 722 (b) (1) and (b) (2)[1] because, according to its brief, "it was depressed in the statutory base period because of a major technological change in its industry and also because it was in receivership throughout most of the base period."

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

On the issues here, to prevail under subsection (b) (1), petitioner must show that its average base period net income is an inadequate standard of normal earnings because its normal production, output, or operation was interrupted or diminished because of the technological change in its industry or its operation by a receiver (events peculiar in its experience). To prevail under subsection (b) (2) it must show that its average base period net income is an inadequate standard of normal earnings because its business was depressed in the base period due to temporary economic circumstances unusual in its case.

We think petitioner must fail because it has not shown diminished production or depressed business in the base period.

The whole history of petitioner is essentially a loss history. In the 12 years of its existence, from 1928 through 1940, it has but 4 years in which net income was reported. Its average annual loss over the 12 years was $9,645.98. During its base period years of 1937 through 1940 the average loss was $6,754.16. The losses in the base period were therefore less than the long-term average. It is difficult to see here, as it was difficult to see in *Toledo Stove & Range Co.*, 16 T. C. 1125, "how a taxpayer with such a persistent history of losses can successfully argue that its average base period net income, which also reflected a persistent series of losses, some of which were not as heavy as in previous years, furnishes an 'inadequate standard of normal earnings'." See also *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220; *Harlan Bourbon & Wine Co.*, 14 T. C. 97; *A. B. Frank Co.*, 19 T. C. 174, aff'd. 211 F. 2d 497. This case is not one like *Ainsworth Manufacturing Corporation*, 23 T. C. 372; *Southern California Edison Co.*, 19 T. C. 935; or *Boonton Molding Co.*, 24 T. C. 1065, where the loss of several large customers due to temporary economic circumstances led to an unusual falling off of earnings in the base period. Here there has been no unusual loss of business.

But even if we assume that petitioner's business was depressed or that its operations were diminished so that its base period earnings are an inadequate standard of normal earnings, petitioner has not established the requisite causal connection between the technological change or the receivership and the inadequate earnings. The change in the method of coating paper may have been an economic event unusual in the case of petitioner, but there was nothing "temporary" about it. So far as the evidence here shows, it was a permanent change in the industry. True, it brought about more severe competition in the standard grade papers between petitioner and its larger competitors in that field and caused a shift in emphasis by petitioner toward the specialty phase of its business, but this was its only effect on petitioner's business. No change at all occurred in the way petitioner conducted its manufacturing operations. It never made use

of the new process and did not attempt to do so. If anything depressed or diminished petitioner's business it was the increased competition with the larger members of its industry, and we have often held that keen competition resulting from economic situations which have apparently become permanent is not such a factor as is contemplated under subsection (b) (2). *Monarch Manufacturing Co.,* 15 T. C. 442; *Seggerman Nixon Corporation,* 26 T. C. 442.

Furthermore, while the receivership may have been an event unusual or peculiar in petitioner's experience we cannot see how the receivership itself directly interrupted or diminished petitioner's normal production, output, or operation in the base period. To the contrary, it appears that the operation of the business was already temporarily halted when the receivership was instituted and that it was the receiver who started things going again in a normal manner with the result that the business, which was otherwise in a failing condition, was built up and preserved. We see no merit in petitioner's contention that the receivership resulted in the interruption or diminution in normal production, output, or operation of petitioner during the base period.

We hold that petitioner has not established that the Commissioner erred in denying relief under section 722 (b) (1) or (b) (2).

### Standard Issues.

The burden of showing error in the Commissioner's determination with respect to these issues is on petitioner. Such findings of fact as we have been able to make are based almost entirely on petitioner's requested findings of fact. As we view them, they amount to little more than assertions of error and we find no factual basis in the record for disturbing the Commissioner's determination.

Reviewed as to section 722 issues by the Special Division.

*Decision will be entered under Rule 50.*