**BURFORD–TOOTHAKER TRACTOR COMPANY, Inc., Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. A. No. 1312–N.**

United States District Court
M. D. Alabama, N. D.
Jan. 10, 1958.

**430**

Ball & Ball, Montgomery, Ala., for plaintiff.

Hartwell Davis, U. S. Atty., and Ralph M. Daughtry, Asst. U. S. Atty., Montgomery, Ala., for defendant.

JOHNSON, District Judge.

This cause was tried before the Court, sitting at Montgomery, Alabama, on October 29, 1957, without a jury. Said cause was submitted upon the issues as made up by the pleadings and the proof, the latter consisting of the oral testimony of several witnesses, stipulations between the parties, and several exhibits. This Court now proceeds to make the appropriate findings of fact and conclusions of law, embodying the same in this memorandum opinion.

In this cause, the plaintiff, Burford-Toothaker Tractor Company, Inc., a corporation, seeks to recover of the defendant, the United States of America, approximately $25,000, this sum representing what the plaintiff contends was an erroneous assessment and collection of income and excess profits taxes, including interest thereon, for the years 1950 through 1952, inclusive.

Plaintiff's claim is based upon two main contentions. They are:

(1) That insofar as plaintiff's business was concerned, the year 1946 was an abnormal year within the meaning of § 442(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 442(a); that said abnormality was such as to affect the determination of the plaintiff-taxpayer's average base period net income. Plaintiff contends defendant's refusal to recognize said abnormality resulted in the erroneous assessment and collection of said taxes.

(2) That said monies received by the plaintiff-taxpayer as a result of transferring to a Montgomery bank certain notes and conditional sales contracts constitute borrowed capital within the meaning of § 439 of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 439.

The plaintiff-taxpayer is a corporation incorporated under the laws of the State of Alabama, with its principal place of business at Montgomery, Alabama. At all times during the years involved in this litigation, the plaintiff-taxpayer was a dealer in road building machinery and farm equipment. During the years involved, the taxpayer filed its income tax returns, together with its schedules for excess profits and computation of corporation excess profits tax. The plaintiff, in each instance, paid the tax liability indicated on its returns and schedules. These returns were subsequently examined by an agent of the defendant, who proposed certain adjustments. The basis for these adjustments was the rejection of taxpayer's application for special relief, as provided by § 442(a) of the Internal Revenue Code of 1939, based on

the alleged abnormality in the year 1946, also by reducing taxpayer's excess profits credit for 1952 and carry-back of unused excess profits credit from 1953. The taxpayer paid the deficiency assessed by virtue of these adjustments, filed timely claims for refund, which claims were disallowed by the Commissioner of Internal Revenue, and this action followed.

Section 442(a) (1) of the Internal Revenue Code of 1939 was added by § 101, Excess Profits Tax Act of 1950, c. 1199, 64 Stat. 1137, 1163, and amended by § 509(a) of the Revenue Act of 1951, c. 521, 65 Stat. 452, 549, and was to be effective for taxable years ending after June 30, 1950. It provides as follows:

"*§ 442. Average base period net income—abnormalities during base period*

"(a) *In general.* If a taxpayer which commenced business on or before the first day of its base period establishes that, for any taxable year within, or beginning or ending within, its base period:

"(1) normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during such taxable year, of events unusual and peculiar in the experience of such taxpayer, or

"(2) the business of the taxpayer was depressed because of temporary economic circumstances unusual in the case of such taxpayer,

the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable. If such taxpayer is also entitled to the benefits of subsection (h), the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (c) or (d), whichever is applicable to the taxpayer, or the amount computed under subsection (h), whichever results in the lesser tax under this subchapter for the tax-

able year. In the case of any other taxpayer entitled to the benefits of subsection (h), the taxpayer's average base period net income determined under this section shall be the amount computed under subsection (h)." * * * 26 U.S.C. 1952 ed., § 442.

In connection with § 442(a) (1), the Commissioner of Internal Revenue issued Treasury Regulations 130, promulgated under the Internal Revenue Code of 1939, § 40.442–2 of which states as follows:

"*Abnormalities—(a) Interruption or diminution of normal production, output, or operation in the base period.*

"(1) § 442 applies if the taxpayer establishes that for any taxable year within, or beginning or ending within, its base period its normal production, output, or operation was interrupted or diminished because of the occurrence either immediately prior to, or during such taxable year, of events unusual and peculiar in the experience of the taxpayer. Activities comprised within the meaning of production, output, or operation include the rendering of services in those cases in which corporations render services rather than manufacture or market tangible products, for example, advertising agencies, brokerage concerns, purchasing agents, etc. Normal production, output, or operation, means the level of production, output, or operation customary for the taxpayer, determined on the basis of the actual experience of the taxpayer up to the time the unusual and peculiar event occurred.

"(2) *Not every interruption or diminution of normal production, output, or operation in the base period may furnish the basis for the application of § 442(a) (1). The interruption or diminution must be significant and not trivial.*"

The plaintiff here claims that two occurrences for the year 1946 constitute abnormalities within the meaning of the applicable law. These occurrences are:

(1) a strike at the main plant of its chief supplier, the Caterpillar Company of Peoria, Illinois, which strike lasted twenty-nine days, and (2) a move that plaintiff made in September of 1946 from its location in downtown Montgomery to a location in the suburbs of Montgomery.

■ In order for these occurrences to be classified as abnormalities, three prerequisites are essential: (1) the occurrence must have occurred either immediately prior to or during the base period; (2) the occurrence must have been peculiar in the experience of the taxpayer; and (3) the occurrence must be the direct cause of the interruption or diminution of normal operations. These prerequisites are set out in a Bulletin on Section 722 of the Internal Revenue Code issued in November, 1944, by the Bureau of Internal Revenue. Although Section 722 of the Internal Revenue Code has been repealed, the provisions of Section 442(a) (1) correspond in scope, as is obvious from the language, to those of Section 722(b) (1), 26 U.S.C. A. Excess Profits Taxes,. § 722(b) (1).

■ It should be noted that even though the Caterpillar Company was plaintiff's chief supplier of machines and parts, plaintiff handled machines and parts of two other lines. It is not disputed that a strike occurred at the plant of the Caterpillar Company on January 23, 1946, as contended by the plaintiff. As a matter of fact, the evidence showed that since the plaintiff had been dealing with the Caterpillar Company (from approximately the year 1934), several strikes had occurred at the main plant of the Caterpillar Company at Peoria, Illinois. There was no evidence in this case as to what plaintiff's inventory was in the way of machines and parts on the date of the strike. The evidence tended to show that prior and up to the time the strike occurred, it was the practice that the Caterpillar Company would notify the taxpayer of the equipment and supplies the taxpayer was scheduled to receive from the Caterpillar Company during the following sixty days. The

Caterpillar Company did not guarantee that any of the machines or supplies would be sent; the evidence showed that the allocation was very often changed, these changes depending upon the actual production by the Caterpillar Company. At times, there were no deliveries even though allocations had been made. It is not disputed by the evidence that Caterpillar machines and parts had been in short supply for approximately fifteen years prior to the date of this trial. It cannot, therefore, be determined by this Court from the evidence the number of Caterpillar machines and the amount of Caterpillar parts which would have been received by the plaintiff-taxpayer had there been no strike. There was no evidence in this case introduced by the plaintiff that any machines or parts were allocated to the taxpayer for the period in which the strike occurred.

■ It is not contended by the defendant in this case that a strike cannot be classed as an abnormality, which would within the meaning of the applicable law affect the base period. The law as to this aspect of plaintiff's contentions seems to be well settled. See Schneiders Modern Bakery, Inc. v. Commissioner, 19 T.C. 763; Triangle Raincoat Co. v. Commissioner, 19 T.C. 548; and D. L. Auld Co. v. Commissioner, 17 T.C. 1199. Plaintiff submits evidence that the average monthly sales of Caterpillar machines for the six months preceding February 1946 was $68,472.36; that the average monthly sales for the months of February and March of 1946 was $33,-683.40; that the average monthly sales for the six months beginning with April 1946 was $58,709.86. This evidence was not disputed. Plaintiff also submitted evidence that its average monthly profit for August, September, October, and November of 1945 and January of 1946 (excluding December 1945 because of certain year-end adjustments) was $17,633.-14; that the average profit for the months of February and March of 1946 was $7,392.38; that the average monthly profit for the six months beginning April 1946 was $17,169.95. This evidence was

not disputed. Plaintiff also submitted evidence that its annual profits were as follows:

| Year | Amount |
|------|--------|
| 1944 | $116,310.14 |
| 1945 | $ 86,300.78 |
| 1946 | $ 80,592.36 |
| 1947 | $148,607.02 |
| 1948 | $170,539.36 |

This evidence was not disputed. It can very readily be seen that there was some diminution in the normal production, output, or operation of plaintiff for the year 1946. However, plaintiff's evidence falls very short of a showing that this diminution or interruption of its normal production, output, or operation was the proximate cause of the strike at the Caterpillar plant. In other words, plaintiff's evidence fails in this respect, since there is no causal connection between this diminution or interruption and the strike in question. A showing of causal connection is essential. See Triangle Raincoat Co., supra, and Pelton and Crane Co. v. Commissioner, 20 T.C. 967.

In connection with the other abnormality claimed by the plaintiff, it is not disputed that the plaintiff did move its business from its downtown location in Montgomery, Alabama, to a new place of business in the suburbs of Montgomery, Alabama. It is not disputed that for four or five months previous to the actual move, the taxpayer and its employees were getting ready for the move. Neither is it disputed that at the time of the actual move the taxpayer's shop was closed for approximately one week. There is no evidence in this case as to the cost of the move, nor the loss of sales suffered by the plaintiff as a consequence of this move. The relocation of the taxpayer's business was voluntarily made for its own convenience. The move was not the result of any "flood, fire, explosions, nor other external cause." It was merely a decision made by the management of the plaintiff for good, sound business reasons. Assuming, but without deciding, that such a move might constitute an abnormality within the meaning of § 442(a) (1), the taxpayer because of the move is not entitled to a determination that there was an abnormality for the year in question, because, again, there is no causal connection between this move and any interruption or diminution in plaintiff's operation.

The Court, therefore, concludes that the taxpayer failed to show any abnormality within the scope of § 442(a) (1) of the Internal Revenue Code of 1939, and that plaintiff is not entitled to disregard the year 1946 when it computes its average base period net income.

As to plaintiff's other contention, the evidence showed that it was capitalized during the period in question at $150,000; that it had a considerable need for working capital and adopted two main procedures for obtaining this working capital. One of these was to negotiate an outright loan with banks on its own note and the other was to obtain monies from the bank by endorsing to the bank with recourse (but without restriction) and delivering to the bank these endorsed promissory notes and conditional sales contracts that it had obtained from the purchasers of machinery and parts. These notes represented the unpaid balance of the purchase price on said machinery and parts, and the conditional sales contracts named the plaintiff as the mortgagee. The evidence showed that the legal limit on the first method plaintiff used to obtain working capital was $120,000. This limit was due to the banking laws of the State of Alabama which restricted this type loan to 10% of the capital and the surplus of the bank. Upon receipt of the notes and contracts endorsed as set out above, the bank would extend to the plaintiff full credit on the amount of these notes, and this total amount would be credited to taxpayer's account with the bank. The transaction was recorded by the bank in its loans and discounts account on an indirect liability sheet, which sheet showed the names of the maker of the note and the name of the taxpayer. The taxpayer showed on its books the transaction in its notes receivable discounted account in the name

of its customer, and did not show any liability to the bank.

The bank charged the taxpayer 4% interest on the credit so extended, while the taxpayer charged its customers 6%. The taxpayer recorded the 4% interest paid as an expense, and the 6% interest received as income.

Taxpayer made all collections from its customers on their notes, and remitted the proceeds to the bank.

The bank accepted all such notes of the taxpayer's customers without regard to the credit rating of the customer and only on the credit of the taxpayer.

There was no written agreement between the taxpayer and the bank.

The bank never notified the customers of the due dates of the installments on their notes, but did notify taxpayer. Taxpayer paid the installments on its customers' notes to the bank regularly even if the customer had not remitted to the taxpayer. If the customer became in default, the taxpayer, not the bank, would repossess the article sold. The bank held all customers' notes for collection and never negotiated them. In all instances, when the bank was paid in full, taxpayer received back the customers' notes and conditional sales contracts. If the customer was not in default, taxpayer returned the note and contract to it. The amount of customer defaults in 1952 and 1953, if any, was not shown.

There is no limit on the amount of the type of financing in which the bank acquired the customers' notes over the taxpayer's unrestricted endorsement with recourse. However, the bank had agreed to handle approximately $200,000 worth of this paper at any one time, and this amount was almost always outstanding.

The taxpayer's annual financial statements and federal income tax returns were prepared by a certified public accountant. On the annual statements, the customers' notes, which had been discounted with recourse by the bank, were shown as current liabilities, but on the monthly statements prepared by the taxpayer which were furnished to the Cater-

pillar Company and on the federal income tax returns, the customers' notes discounted were shown as an offset or as a reduction of notes receivable, an asset. In the text of the report attached to the annual financial statement, the item of notes receivable discounted was discussed under the category of notes receivable, a current asset. Caterpillar Company required its dealers to show customers' notes receivable discounted as an offset to the asset notes receivable.

No authority was introduced to support the treatment of customers' notes receivable discounted as a current liability rather than as an offset to notes receivable, a current asset.

The certified public accountant based his opinion that customers' notes receivable discounted were current liabilities, and not an offset to notes receivable, an asset, on his belief that though the customers were legally primarily liable to the bank, they were not actually liable, and that the taxpayer was actually liable to the bank, though legally only secondarily liable.

The bank representative stated that they regarded both the customer and the taxpayer as being directly liable on the notes.

Customers' notes receivable discounted should be treated consistently as borrowed capital for purposes of the computation of the credit for the base period, and the credit for 1952 and 1953.

Section 439(b) (1) of the Internal Revenue Code of 1939 is as follows:

"§ 439. Borrowed Capital.

\* \* \* \* \* \*

"(b) Daily Borrowed Capital. For the purposes of this subchapter, the daily borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the

business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgagee, deed of trust, bank loan agreement, or conditional sales contract. In the case of property of the taxpayer subject to a mortgage or other lien, the amount of indebtedness secured by such mortgage or lien shall be considered as an indebtedness of the taxpayer whether or not the taxpayer assumed or agreed to pay such indebtedness, plus" * * * 26 U.S.C. 1952 ed., § 439.

Treasury Regulations 130 issued to supplement this part of the statute is as follows:

"Sec. 40.439–1 *Borrowed capital.* (a) The amount of the average borrowed capital of a corporation shall be computed in the manner provided in section 439(a) and the daily borrowed capital, as defined in sections 439(b) (1), (2), (3) and (4), shall be computed in the manner provided in section 439(b). The average borrowed capital for any taxable year is the aggregate of the daily borrowed capital for each day of the taxable year, divided by the number of days in such taxable year. Daily borrowed capital for any day of the taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts:

"(1) The amount of the outstanding indebtedness (other than interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, promissory note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract, plus" * * *

In order for plaintiff to be entitled to the benefits of the applicable law concerning "borrowed capital" it must show two things. They are: (1) That there be an outstanding indebtedness and (2) that the indebtedness be evidenced by one of the specific types of instruments named. See Canister Co. v. Commissioner, 3 Cir., 164 F.2d 579, certiorari denied 333 U.S. 874, 68 S.Ct. 904, 92 L.Ed. 1150. This Court is of the opinion and now concludes that taxpayer's evidence fails to meet the requirement that there was between the taxpayer and the bank in these instances an outstanding indebtedness. An obligation cannot be called a debt when there is no certainty that the alleged debtor will be required to pay. See C. L. Downey Co. v. Commissioner, 10 T. C. 837, affirmed, 8 Cir., 172 F.2d 810. In this case, by virtue of endorsing the notes to the bank, taxpayer remained contingently liable; that is, the taxpayer would only be liable when the maker defaulted. This uncertainty makes taxpayer's liability contingent. Therefore, even assuming that taxpayer's evidence meets the second of the two requirements (and there is considerable doubt that it does), the taxpayer has failed to support this contention by its evidence. As a matter of fact, there is no evidence that there was any liability by written agreement or by operation of law that the plaintiff would be liable to the bank except when the maker of these discounted notes would default. Thus, the Commissioner of Internal Revenue properly excluded the monies received by taxpayer from discounting these notes in computing the taxpayer's daily borrowed capital within the meaning of § 439 of the Internal Revenue Code of 1939.

In accordance with the foregoing, an order will be entered denying the relief sought in this action by the plaintiff.