SOUTHERN ACID & SULPHUR COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27024. Filed August 19, 1958.

*Carl J. Batter, Esq.*, for the petitioner.
*Irene F. Scott, Esq.*, and *Philon D. Wigder, Esq.*, for the respondent.

Petitioner filed applications for relief from excess profits taxes pursuant to section 722 of the Internal Revenue Code of 1939 as follows:

| Fiscal year ending March 31 | Amount |
| --- | --- |
| 1942 | $147, 838. 08 |
| 1943 | 463, 401. 81 |
| 1944 | 243, 676. 58 |
| 1945 | 245, 070. 45 |
| 1946 | 73, 051. 23 |

Upon disallowance of these applications petitioner filed a petition with this Court. The applications and the petition sought relief under the provisions of section 722 (b) (2), (3), and (4) of the Code.[1] At the hearing petitioner waived its claim under section 722 (b) (3).

The issue is whether respondent correctly denied petitioner's applications for relief under section 722 (b) (2) and 722 (b) (4).

The case was heard before a commissioner of the Court. His report of findings of fact, which is incorporated herein by this reference, was duly submitted and the parties filed their objections thereto. Consideration has been given to such objections and certain modifications have been made in the reported findings.

---

[1] Unless otherwise indicated, all references to Code section numbers refer to the Internal Revenue Code of 1939.

## FINDINGS OF FACT.

The petitioner was incorporated in 1917 under the laws of the State of Illinois and reincorporated in 1925 under the laws of the State of Virginia. Throughout the period involved it maintained its principal office at St. Louis, Missouri.

During and prior to 1931 petitioner filed its Federal tax returns and maintained its books of account on a calendar year basis. Petitioner filed a tax return for the period January 1 to March 31, 1932, and thereafter and through all the years here involved filed its Federal tax returns and maintained its books of account on a fiscal year basis ending March 31. Its excess profits tax returns for the years here involved were filed with the then collector of internal revenue for the first district of Missouri at St. Louis.

Petitioner's taxable net income, as finally determined by respondent and agreed to by petitioner for each of the periods from January 1, 1922, to and including March 31, 1946, was as follows (cents omitted):

| Calendar year | Taxable net income | Fiscal year ended March 31 | Taxable net income |
|---|---|---|---|
| 1922 | $256,412 | 1933 | $106,733 |
| 1923 | 223,182 | 1934 | 158,538 |
| 1924 | 282,978 | 1935 | 137,369 |
| 1925 | 259,809 | 1936 | 113,373 |
| 1926 | 421,953 | 1937 | 182,121 |
| 1927 | 227,082 | 1938 | 153,932 |
| 1928 | 347,049 | 1939 | 104,869 |
| 1929 | 446,174 | 1940 | 162,843 |
| 1930 | 385,264 | 1941 | 229,402 |
| 1931 | 87,601 | 1942 | 476,316 |
| 1932 (first 3 months) | 31,408 | 1943 | 737,733 |
| | | 1944 | 932,486 |
| | | 1945 | 664,073 |
| | | 1946 | 408,062 |

Petitioner's excess profits credit computed by the invested capital method for the years 1942 through 1946 was as follows:

| Fiscal year ended March 31 | Excess profits credit |
|---|---|
| 1942 | $164,831.35 |
| 1943 | 178,974.11 |
| 1944 | 189,962.06 |
| 1945 | 211,677.28 |
| 1946 | 249,657.72 |

Petitioner's base period excess profits net income for each of its base period years and the average thereof were as follows:

| Fiscal year ended March 31 | Excess profits net income |
|---|---|
| 1937 | $148,996.68 |
| 1938 | 154,644.15 |
| 1939 | 99,593.67 |
| 1940 | 153,724.81 |
| Average | 139,239.83 |

During the statutory base period and the tax years here at issue petitioner was engaged in the business of producing and marketing sulphuric acid, milled and refined sulphur, muriatic acid and salt cake, commercial fertilizer, and related products.

Petitioner operated sulphuric acid plants at Port Arthur, Texas, beginning in 1922, at Shreveport, Louisiana, beginning in 1929, and at Beaumont, Texas, beginning in 1930. Petitioner also operated a sulphuric acid plant at North Little Rock, Arkansas, from 1922 to or through 1930.

The Port Arthur, Shreveport, and Beaumont plants used the "contact" process, which produced sulphuric acid of a strength satisfactory for use in the manufacture and refining of petroleum products.

From 1922 through the base period petitioner's market for sulphuric acid consisted primarily of petroleum refineries located near its plants in the Texas-Louisiana area, including refineries of the Texas Company, Magnolia Oil Company, Pure Oil Company, Louisiana Oil Company, American Oil Company, and Shell Oil Company. The shipping cost of sulphuric acid is very high relative to its cost of production, and it is usually marketed in areas geographically close to its point of manufacture.

On August 29, 1918, petitioner entered into the first of a series of contracts with the Texas Company, one or more of which was in effect for the entire period from 1918 to and beyond 1946. Pursuant to the contract of August 29, 1918, petitioner erected a plant for the manufacture of sulphuric acid by the contact process on land of the Texas Company, adjacent to its oil refinery at Port Arthur, Texas.

The various contracts provided for the minimum monthly quantities of 98 per cent equivalent sulphuric acid that would be taken by the Texas Company, the maximum monthly quantities petitioner would be required to supply, and a determination of the price. Nothing in any of these contracts prohibited petitioner from selling sulphuric acid manufactured at its Port Arthur plant to customers other than the Texas Company.

Throughout the entire period from 1922 through the years here involved petitioner had yearly or 2-year contracts with Magnolia Oil Company to supply its Beaumont, Texas, refinery with that plant's entire requirements of sulphuric acid, and with Pure Oil Company to supply its Scott's Bluff, Texas, plant with its requirements of sulphuric acid. These contracts were at a fixed price per ton which differed with the various contracts.

During the base period years petitioner's productive capacity was at all times sufficient to supply the demand of its customers.

Petitioner's sales of new sulphuric acid (98 per cent equivalent) in short tons and its operating profits in dollars at the Port Arthur, Shreveport, and Beaumont plants for stated periods were as follows:

| | Port Arthur | | Shreveport | | Beaumont | |
|---|---|---|---|---|---|---|
| | Sales | Operating profit | Sales [1] | Operating profit | Sales | Operating profit |
| **Calendar year** | | | | | | |
| 1922 | 38, 217 | $186, 843 | | | | |
| 1923 | 47, 294 | 210, 103 | | | | |
| 1924 | 50, 606 | 243, 357 | | | | |
| 1925 | 63, 795 | 291, 433 | | | | |
| 1926 | 68, 151 | 283, 656 | | | | |
| 1927 | 71, 245 | 197, 264 | | | | |
| 1928 | 73, 989 | 242, 184 | | | | |
| 1929 | 81, 460 | 349, 686 | 14, 657 | $67, 629 | | |
| 1930 | 87, 000 | 310, 310 | 32, 878 | 151, 885 | 6, 614 | $14, 936 |
| 1931 | 46, 310 | 126, 178 | 17, 846 | 58, 056 | 18, 875 | 34, 286 |
| Jan. 1, 1932–Mar. 31, 1932 | 10, 011 | 30, 837 | 4, 814 | 15, 162 | 3, 100 | 1, 293 |
| **Fiscal year ended March 31** | | | | | | |
| 1933 | 40, 770 | 127, 609 | 16, 103 | 48, 885 | 11, 855 | 23, 205 |
| 1934 | 40, 255 | 115, 562 | 11, 107 | 18, 398 | 19, 976 | 35, 446 |
| 1935 | 36, 102 | 117, 862 | 6, 475 | 13, 564 | 14, 307 | 62, 196 |
| 1936 | 31, 545 | 94, 462 | 7, 173 | 17, 817 | 8, 915 | 27, 145 |
| 1937 | 33, 775 | 98, 997 | 14, 186 | 39, 068 | 7, 023 | 24, 384 |
| 1938 | 34, 406 | 96, 726 | 17, 224 | 56, 736 | 7, 715 | 24, 622 |
| 1939 | 24, 097 | 60, 926 | 10, 440 | 21, 318 | 8, 492 | 37, 830 |
| 1940 | 23, 392 | 63, 266 | 13, 042 | 41, 025 | 9, 509 | 35, 470 |
| 1941 | 19, 914 | 54, 322 | 14, 661 | 44, 025 | 16, 525 | 102, 728 |
| 1942 | 41, 523 | 167, 562 | 26, 871 | 88, 364 | 19, 354 | 77, 207 |
| 1943 | 62, 785 | 290, 766 | 42, 199 | 149, 309 | 44, 012 | 155, 380 |
| 1944 | 89, 827 | 262, 969 | [2] 150, 975 | 464, 734 | 48, 266 | 49, 367 |
| 1945 | 82, 319 | 155, 442 | [3] 128, 881 | 462, 612 | 42, 624 | 57, 727 |
| 1946 | 50, 185 | 143, 323 | [4] 75, 682 | 259, 728 | 35, 033 | 83, 410 |

[1] Sales include interplant transfers.
[2] Includes 72,762 tons purchased.
[3] Includes 68,291 tons purchased.
[4] Includes 12,943 tons purchased.

In addition to manufacturing *new* 98 per cent equivalent sulphuric acid, petitioner refortified sulphuric acid that had been reduced in strength by use. Petitioner's Port Arthur plant charged the Texas Company $1 per ton for refortifying the latter's recovered acid. Petitioner's Beaumont plant also refortified recovered sulphuric acid to the strength requested by its customers. Production of refortified sulphuric acid, in short tons, at petitioner's Port Arthur and Beaumont plants for the years 1922 through March 31, 1946, was as follows:

| | Port Arthur (short tons) | Beaumont (short tons) | | Port Arthur (short tons) | Beaumont (short tons) |
|---|---|---|---|---|---|
| **Calendar year** | | | **Fiscal year ended March 31** | | |
| 1922 [1] | 12, 017 | | 1933 | 25, 274 | |
| 1923 | 22, 186 | | 1934 | 22, 181 | 2, 043 |
| 1924 | 27, 710 | | 1935 | 22, 783 | |
| 1925 | 11, 106 | | 1936 | 16, 144 | |
| 1926 | 9, 526 | | 1937 | 13, 630 | |
| 1927 | 12, 817 | | 1938 | 16, 406 | |
| 1928 | 10, 004 | | 1939 | 13, 764 | |
| 1929 | 24, 413 | | 1940 | 13, 303 | |
| 1930 | 29, 812 | 2, 522 | 1941 | 11, 643 | 7, 421 |
| 1931 | 20, 407 | 3, 846 | 1942 | 16, 182 | 3, 034 |
| Jan. 1, 1932–Mar. 31, 1932. | 10, 899 | | 1943 | [2] 40, 989 | 8, 071 |
| | | | 1944 | [2] 53, 419 | 13, 716 |
| | | | 1945 | [2] 52, 967 | 14, 030 |
| | | | 1946 | 30, 553 | 6, 802 |

[1] 11 months.
[2] Includes substantial quantities of refortified acid to Magnolia Oil Company.

The petroleum refining industry has used sulphuric acid in its various processes for many years. The amount of sulphuric acid consumed in refining crude petroleum depends, at least in part, on whether the crude is "sweet" or "sour." Crude oils containing quantities of sulphuric compounds and minerals are known as sour. Crude oils with relatively less sulphuric compounds and minerals are known as sweet. If the crude oil is sweet, less sulphuric acid is required in the refining process than if it is sour. The crude oils from the West Texas fields are sour, while those from the East Texas fields are sweet. The East Texas oil fields were opened up about 1930. These fields proved to be an extremely large source of crude oil and are still producing.

The early gasolines were rather yellow, unstable, and gum forming. They were treated with sulphuric acid in order to remove some of the color and gum-forming tendencies. Such treatment was expensive and much of the yield was lost thereby. As soon as it was possible to make gasoline colored, other techniques were developed for its stabilization. When tetraethyl lead became available it was used first in the premium or superior grades of gasoline, which were colored. About 1931 tetraethyl lead also began to be used by the oil companies in their regular grades of gasolines with the result that the use of sulphuric acid in the refining of gasolines declined as it was replaced by other processes. About the same time that these technological changes were taking place in the refining of gasolines, the "furfural" and the "propane de-asphalting" processes, both of which were solvent processes for the removal of deleterious fractions of lubricating oils, began to replace the sulphuric acid treatment of such oils. These solvent processes were used only in the manufacture of improved motor oils, not in the manufacture of industrial oils. They decreased the amount of sulphuric acid used in the manufacture of motor lubricating oils as compared with the amounts used before they were adopted. The former sulphuric acid treatments of gasoline and lubricating oils have not returned to use.

From 1923 through 1946 the consumption of sulphuric acid by the petroleum refining industry was fairly constant in terms of annual tonnage, but gradually decreased in terms of pounds of acid consumed per barrel of crude petroleum run to the stills, as shown by the following table:

| Year | Consumption of sulphuric acid by petroleum-refining industry | | | |
|---|---|---|---|---|
| | Annual runs crude petroleum to stills in thousands of bbl.[1] | Annual total | | Pounds per bbl. of crude |
| | | Thousands of short tons | Millions of pounds | |
| 1923 | 581,244 | 1,200 | 2,400 | 4.129 |
| 1924 | 643,716 | 1,300 | 2,600 | 4.039 |
| 1925 | 739,920 | 1,450 | 2,900 | 3.919 |
| 1926 | 779,268 | 1,325 | 2,650 | 3.401 |
| 1927 | 828,840 | 1,250 | 2,500 | 3.016 |
| 1928 | 913,296 | 1,350 | 2,700 | 2.956 |
| 1929 | 987,708 | 1,570 | 3,140 | 3.180 |
| 1930 | 927,444 | 1,420 | 2,840 | 3.062 |
| 1931 | 894,612 | 1,348 | 2,696 | 3.014 |
| 1932 | 819,996 | 1,240 | 2,480 | 3.024 |
| 1933 | 861,252 | 1,140 | 2,280 | 2.648 |
| 1934 | 895,632 | 1,100 | 2,200 | 2.456 |
| 1935 | 965,796 | 980 | 1,960 | 2.030 |
| 1936 | 1,068,576 | 1,100 | 2,200 | 2.058 |
| 1937 | 1,183,440 | 1,100 | 2,200 | 1.858 |
| 1938 | 1,165,020 | 1,100 | 2,200 | 1.888 |
| 1939 | 1,237,836 | 1,210 | 2,420 | 1.956 |
| 1940 | 1,294,164 | 1,260 | 2,520 | 1.948 |
| 1941 | 1,409,196 | 1,400 | 2,800 | 1.986 |
| 1942 | 1,334,100 | 1,650 | 3,300 | 2.474 |
| 1943 | 1,429,740 | 1,720 | 3,440 | 2.406 |
| 1944 | 1,665,684 | 1,640 | 3,280 | 1.970 |
| 1945 | 1,719,540 | 1,640 | 3,280 | 1.908 |
| 1946 | 1,730,196 | 1,608 | 3,216 | 1.858 |

[1] Barrels of 42 gallons.

During the early 1930's and until sometime in 1939, 100-octane aviation gasoline was produced in small quantities at various refineries by a number of processes, none of which was completely satisfactory. About 1938 the sulphuric acid alkylation process was perfected which produced a so-called "alkylate." When this alkylate was blended properly with superior fractions of gasoline, 100-octane aviation gasoline was obtained. The sulphuric acid alkylation process for manufacturing 100-octane aviation gasoline was a new use for sulphuric acid and was considerably cheaper than the processes previously utilized.

In June 1939 the Texas Company was engaged in constructing an alkylation plant at Port Arthur to make 100-octane gasoline. This plant began operating in August 1939 with a capacity of 400 barrels of aviation alkylate per day. Petitioner's officers knew about this construction and expected an increased use of sulphuric acid to result. On June 29, 1939, petitioner's plant manager estimated that it would cost $5,679.90 to rehabilitate one of its sulphuric acid-producing units which would be needed to "carry most of this added load on our manufacturing facilities." During 1939 petitioner rehabilitated the unit at a cost of $4,306.26.

In the sulphuric acid alkylation process, acid of 98 per cent strength (the other 2 per cent being water) acts as a catalyst. Theoretically, none of the sulphuric acid should be used up, but actually it reacts

to some extent and becomes diluted with water and hydrocarbons. When this dilution reduces the sulphuric acid to about 90 or 92 per cent strength, it is no longer useful in the alkylation system and is withdrawn. In manufacturing the alkylate, 98 per cent strength acid is fed into the system as the 90 or 92 per cent acid is withdrawn. The acid withdrawn may be used for other refining purposes, such as processing lubricating oils and distillates, or it may be refortified to 98 per cent strength and utilized again in the alkylation process. The net amount of sulphuric acid consumed in the alkylation process depends upon the usage made of the 90 or 92 per cent acid by the oil refinery. It commonly is about 10 per cent of the new acid fed into the alkylation system and is small compared with the total acid usage of the petroleum industry.

In 1938 the total consumption of aviation gasoline in the United States for commercial, private, and governmental purposes was approximately 100 million gallons. From 1936 through 1940, except for small amounts used in transoceanic commercial flights and for experimental purposes, 100-octane gasoline was used only for military purposes. Around 1939 the French and British took the main part of the 100-octane gasoline produced here. The productive capacity of the United States by the middle of 1940 was about 40,000 barrels of 100-octane gasoline a day, while consumption was about 13,000 barrels per day. After Pearl Harbor (December 7, 1941) 100-octane gasoline was produced by all available techniques, regardless of cost, and by the end of the war this country was producing almost 500,000 barrels per day.

Petitioner's principal competitor in the sulphuric acid business was the Texas Chemical Company. Prior to 1930, Texas Chemical Company had only one sulphuric acid plant in the area served by petitioner. This plant was located at Houston, Texas. About 1930 Texas Chemical Company built sulphuric acid plants at Fort Worth, Texas, and Baton Rouge, Louisiana. These plants were more advantageously located to certain refineries previously served by petitioner than were petitioner's plants. As a result, Texas Chemical Company obtained certain customers and sales from other customers previously completely supplied by petitioner. The customers lost as a result of such competition were not thereafter regained.

Petitioner's North Little Rock plant used the "chamber" process, which produced sulphuric acid of insufficient strength for use in the petroleum industry but strong enough for use in fertilizers.

The main customer of the North Little Rock plant was the Arkansas Fertilizer Company, which went out of business about 1930 or 1931. With no outlet for the acid produced at North Little Rock, petitioner closed the plant in 1930.

In 1935 petitioner leased the plant of the Arkansas Fertilizer Company for 1 year, with an option to buy. In October 1936 petitioner exercised its option and purchased the plant.

Included in the purchase price were the brands and trade-marks of the former company. The manager of the former company, who, in the interim, had been operating his own fertilizer company, was persuaded to give up his individual business and take charge of the leased plant. He brought with him the brand name used in his individual enterprise. Petitioner operated the business as the Arkansas Fertilizer Division of the Southern Acid and Sulphur Company.

The sales of petitioner's Arkansas Fertilizer Division for the fiscal years ended March 31, 1936 through 1946, in dollars and tons, its operating profit, average sales price per ton, and average cost per ton were as follows:

| Fiscal year ended March 31 | Sales | | Operating profit | Average sales price per ton | Average cost per ton |
|---|---|---|---|---|---|
| | Dollars | Tons | | | |
| 1936 | $98,017.32 | 13,074 | $14,306.35 | $7.50 | $5.74 |
| 1937 | 281,580.35 | 16,538 | 21,022.27 | 17.03 | 13.24 |
| 1938 | 297,583.68 | 16,572 | 12,449.77 | 17.96 | 14.34 |
| 1939 | 263,453.69 | 14,274 | 8,822.15 | 18.46 | 14.66 |
| 1940 | 303,930.88 | 17,342 | 27,621.78 | 17.53 | 13.59 |
| 1941 | 454,380.02 | 17,638 | 6,427.95 | 25.76 | 22.49 |
| 1942 | 1,031,167.13 | 34,876 | 83,913.17 | 29.57 | 24.97 |
| 1943 | 1,997,187.00 | 88,888 | 206,377.00 | 22.46 | 19.24 |
| 1944 | 1,954,858.22 | 92,586 | 132,753.96 | 21.11 | 18.72 |
| 1945 | 2,110,032.37 | 106,250 | 182,698.01 | 19.85 | 17.39 |
| 1946 | 2,467,233.81 | 118,186 | 242,417.09 | 20.87 | 18.07 |

The following table shows the amounts of fertilizer, in short tons, consumed in the State of Arkansas for the years indicated:

| Year | Short tons | Year | Short tons |
|---|---|---|---|
| 1922 | 36,115 | 1935 | 39,630 |
| 1923 | 79,616 | 1936 | 48,931 |
| 1924 | 96,750 | 1937 | 68,675 |
| 1925 | 123,387 | 1938 | 67,800 |
| 1926 | 126,175 | 1939 | 74,122 |
| 1927 | 75,487 | 1940 | 101,000 |
| 1928 | 126,391 | 1941 | 123,975 |
| 1929 | 156,582 | 1942 | 140,458 |
| 1930 | 157,648 | 1943 | 182,865 |
| 1931 | 62,096 | 1944 | 131,083 |
| 1932 | 17,348 | 1945 | 126,650 |
| 1933 | 22,140 | 1946 | 171,250 |
| 1934 | 41,620 | | |

During the fiscal years ended March 31, 1936 through 1946, petitioner's Arkansas Fertilizer Division showed trucking and miscellaneous expenses on its books in various amounts. For the fiscal year ended March 31, 1940, this account showed an unexplained credit of $12,521.05.

From January 1922 through March 1940 petitioner sold processed sulphur from a processing plant at Texarkana, on the Texas-Arkansas border. For many years the plant secured raw sulphur for processing from Lake Charles, Louisiana. Petitioner's outlets for its processed sulphur were primarily the rubber companies in the Northeast and in Ohio. Since both Lake Charles and Texarkana were on the Kansas City Southern Railroad, petitioner secured favorable freight rates on its sulphur shipments. By 1939 Texas had become the principal source of raw sulphur and Houston was in the center of the sulphur-producing area.

Prior to and during the base period years the citrus fruit industry in the Rio Grande Valley provided an additional outlet for processed sulphur. Petitioner was at a disadvantage in competing for this citrus fruit business as it had to ship raw sulphur to its Texarkana plant for processing and then back-haul the processed sulphur.

In 1939, before the close of the base period, petitioner, investing $263,500, erected a sulphur-processing plant at Houston with a rated normal capacity of 25,000 tons. Petitioner expected a 30 or 40 per cent gross return upon this investment. Houston was chosen for the plantsite because it was near the location of raw materials, the freight rate to the Rio Grande Valley was less than from Texarkana, it had access to deep water necessary for an export business, and the plant at Texarkana was old and in need of rehabilitation.

From January 1, 1922, through March 31, 1940, petitioner's Texarkana sulphur plant sold processed sulphur, had net sales, and showed operating profits as follows:

| | Sales | | Operating profit |
|---|---|---|---|
| | Short tons | Dollars | |
| *Calendar year* | | | |
| 1922 | 11,987 | $325,778.74 | $88,535 |
| 1923 | 13,034 | 363,498.16 | 109,053 |
| 1924 | 13,236 | 384,490.95 | 80,084 |
| 1925 | 15,969 | 398,172.44 | 108,575 |
| 1926 | 15,725 | 465,242.61 | 129,043 |
| 1927 | 10,437 | 319,933.69 | 59,487 |
| 1928 | 10,943 | 207,983.20 | 75,613 |
| 1929 | 12,378 | 363,145.46 | 49,640 |
| 1930 | 7,991 | 230,959.43 | 17,572 |
| 1931 | 6,379 | 166,937.49 | (4,227) |
| Jan. 1 to Mar. 31, 1932 | 935 | 23,780.69 | (5,840) |
| *Fiscal year ended March 31* | | | |
| 1933 | 4,340 | 138,889.42 | 1,342 |
| 1934 | 6,563 | 208,474.42 | 22,714 |
| 1935 | 5,241 | 180,497.33 | 25,423 |
| 1936 | 7,129 | 234,004.69 | 39,971 |
| 1937 | 8,797 | 291,077.56 | 46,888 |
| 1938 | 8,195 | 294,216.97 | 36,987 |
| 1939 | 7,324 | 258,622.67 | 34,963 |
| 1940 | 5,744 | 236,951.45 | 23,375 |

Net sales of petitioner's Houston sulphur plant for the period October 1939 to March 31, 1946, its operating profit, cost of production per ton, and its selling price per ton were as follows:

| Fiscal year ended March 31 | Sales | | Operating profit | Per ton | |
|---|---|---|---|---|---|
| | Short tons | Dollars | | Cost | Selling price |
| October 1939–Mar. 31, 1940 | 3,030 | $82,289 | $6,458 | $22.27 | $27.16 |
| 1941 | 12,819 | 385,612 | 62,470 | 22.93 | 30.08 |
| 1942 | 15,516 | 477,079 | 95,678 | 22.50 | 30.75 |
| 1943 | 11,784 | 366,176 | 41,803 | 24.68 | 31.07 |
| 1944 | 18,747 | 608,741 | 110,741 | 23.65 | 32.47 |
| 1945 | 15,016 | 481,596 | 44,502 | 25.49 | 32.07 |
| 1946 | 18,196 | 542,697 | 41,286 | 24.64 | 29.83 |

During the period 1936 to 1946 petitioner shipped processed sulphur to destinations in the Rio Grande Valley from its Texarkana and its Houston plants in the following amounts (short tons):

| Calendar year | Shipments | Calendar year | Shipments |
|---|---|---|---|
| 1936 | 1,180 | 1942 | 1,875 |
| 1937 | 1,480 | 1943 | 2,140 |
| 1938 | 1,320 | 1944 | 3,480 |
| 1939 | 1,520 | 1945 | 3,407 |
| 1940 | 1,280 | 1946 | 5,340 |
| 1941 | 1,780 | | |

The freight rates for shipping crude sulphur from the mine (Newgulf) to the mill at Houston for processing and then shipping the refined sulphur to the Rio Grande Valley (Harlingen), where it was used as an insecticide, were less than the cost of shipping crude sulphur from Newgulf to Texarkana and then shipping the refined sulphur to Harlingen. On February 15, 1939, and thereafter, the freight saving in shipping to and from Houston as compared with shipments to and from Texarkana was 27 cents per cwt., less a $3.96 transit charge per carload amounting to approximately 1 cent per cwt., based on a 40,000 pound carload minimum.

When it shipped from Texarkana, petitioner's prices in the Rio Grande Valley for ground sulphur as a spray were competitive with other companies. When it commenced shipping from Houston, the same prices were maintained.

Prior to the beginning of operations at the Houston plant petitioner exported no sulphur. Beginning with the period October 1939 to March 31, 1940, petitioner entered the export market, its export business in such short period being $2,084. Petitioner's export sales in dollars for the fiscal years March 31, 1941 through 1944, were: $84,421, $103,604, $62,034, and $230,988, respectively. Export sales constituted 2.5 per cent, 21.9 per cent, 21.7 per cent, and 16.9 per cent of petitioner's net sales at its Houston plant for the fiscal periods

ending March 31, 1940 through 1943, respectively. Petitioner's export shipments, in short tons, for the calendar years 1940 through 1947 were as follows:

| Calendar year | Short tons | Calendar year | Short tons |
|---|---|---|---|
| 1940 | 2, 396 | 1944 | 3, 990 |
| 1941 | 2, 295 | 1945 | 2, 457 |
| 1942 | 3, 094 | 1946 | 11, 015 |
| 1943 | 6, 055 | 1947 | 14, 329 |

Although the possibility of establishing an export business was realized, the main reason for building a sulphur-processing plant at Houston was the increasing consumption of sulphur in the Rio Grande Valley.

In 1938 petitioner constructed a muriatic acid plant at Shreveport, Louisiana. The plant started operations in 1938 and closed in 1944. Its net sales and its gross profit or loss from operations for the fiscal years ended March 31, 1939 through 1944, were as follows:

| Fiscal year ended March 31 | Sales | | Gross profit (or loss) |
|---|---|---|---|
| | Tons | Dollars | |
| 1939 | 3, 387 | $34, 544. 80 | ($17, 333. 05) |
| 1940 | 6, 405 | 66, 876. 14 | (1, 734. 11) |
| 1941 | 7, 921 | 95, 568. 74 | 11, 952. 52 |
| 1942 | 7, 845 | 112, 973. 38 | 10, 379. 34 |
| 1943 | 3, 881 | 54, 249. 86 | (655. 84) |
| 1944 | 382 | 3, 972. 81 | (346. 61) |

Petitioner has not shown its decreased earnings during the base period years to have been due to a temporary economic condition.

The acquisition of the Arkansas fertilizer plant immediately prior to the base period and the erection during the base period years of a muriatic acid plant at Shreveport and a sulphur-grinding and -refining plant at Houston constituted changes in the character of petitioner's business.

Petitioner has not shown what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period.

OPINION.

VAN FOSSAN, *Judge:* The petitioner brings claims for relief under section 722 (b) (2) and (b) (4) of the Code.[2]

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discrimi-

The petitioner contends that it is entitled to reconstruct earnings for the base period under section 722 (b) (2) because the industry of which it was a member was depressed during the base period years. To prevail under section 722 (b) (2) it is incumbent upon the petitioner to prove that its business, or the business of the industry of which it was a member, was depressed during the base period and that this depression was caused by a temporary economic circumstance unusual in the case of the taxpayer or its industry. *Wadley Co.*, 17 T. C. 269 (1951).

In support of its assertion petitioner argues that the advent in 1935 of the furfural process for refining motor oils and the subsequent disuse of sulphuric acid for that purpose caused a temporary depression in petitioner's industry which was not corrected until a new use for sulphuric acid was created by the introduction of the alkylation process for the refining of 100-octane gasoline in 1939.

The facts do not sustain petitioner's contentions. The advent of the furfural process for the refining of motor oils was only one of several changes taking place over a period of years which tended to decrease the uses for sulphuric acid in the petroleum-refining industry. Other changes included the development of better techniques for the refining of gasolines, and the opening up in 1930 of the East Texas oil fields which produced a sweet crude oil requiring less sulphuric acid to refine. The number of pounds of sulphuric acid consumed by the petroleum-refining industry for every barrel of crude petroleum run to the stills decreased gradually from 1923 to 1946.

The development of the furfural process was but one facet of a broader trend, under the conditions of which petitioner's industry had been operating for a number of years. It was, therefore, not a temporary economic event and does not justify the granting of relief under

---

natory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. \* \* \*

section 722 (b) (2). Cf. *Winter Paper Stock Co.*, 14 T. C. 1312 (1950).

Even were we to assume that the discontinuance of the use of sulphuric acid in the refining of motor oils caused a larger drop in the demand for sulphuric acid than any other of the aforementioned changes, we would still be unable to conclude that it constituted a temporary economic event depressing petitioner's industry. The change to the furfural process was a permanent technical advance in a dynamic industry—not a temporary measure—and is not a basis for relief under section 722 (b) (2). Cf. *Miami Valley Coated Paper Co.*, 28 T. C. 492 (1957), aff'd. 211 F. 2d 422 (C. A. 6).

The development in 1939 of the sulphuric acid alkylation process for the refining of 100-octane gasoline did not, as petitioner contends, correct the depression in petitioner's sales. It is true that it was a new use for sulphuric acid; however, the facts do not show that the development of the sulphuric acid alkylation process greatly increased the demand for sulphuric acid prior to the entry of the United States into World War II, or that there would have been such an increase had the process been developed 2 years earlier than it actually was. The alkylation process consumes only a small amount of sulphuric acid as compared to the petroleum-refining industry as a whole. Furthermore, little 100-octane gasoline was used until after the attack on Pearl Harbor, December 7, 1941.

Respondent correctly denied petitioner's claims for relief under section 722 (b) (2).

Petitioner also asserts it is entitled to relief under section 722 (b) (4). As justification for its claim petitioner sets forth the following changes occurring during its base period: The advent of the alkylation process of refining high test gasoline and the increased use of sulphuric acid in such process; the construction of a sulphur-grinding and -refining plant at Houston, with the attendant favorable freight rates and access to an export market; the conversion during the base period years of the sulphuric acid plant at North Little Rock, Arkansas, to warehousing purposes; the acquisition of the Arkansas Fertilizer Division; and the erection of a muriatic acid plant at Shreveport.

The new use of sulphuric acid in the alkylation process for the manufacture of 100-octane gasoline was a change brought about by the petroleum refiners, not by the petitioner, and thus does not come within the provisions of section 722 (b) (4). *Constitution Publishing Co.*, 23 T. C. 19, 30 (1954).

Petitioner has introduced no evidence to show that the conversion of the North Little Rock sulphuric acid plant to warehousing purposes in any way affected normal base period earnings and has therefore failed to establish such conversion as a basis for relief.

We have no doubt that the acquisition of the Arkansas Fertilizer Division, the construction of the sulphur-grinding and -refining plant at Houston, and the erection of the muriatic acid plant at Shreveport were changes within the meaning of section 722 (b) (4). *Wisconsin Farmer Co.*, 14 T. C. 1021 (1950). Nonetheless, we are unable to grant relief.

The establishment of eligibility for relief is only one of the factors that must be considered. *Powell-Hackney Grocery Co.*, 17 T. C. 1484 (1952). Section 722 (a) requires the petitioner also to establish a fair and just amount representing normal earnings to be used as a constructive base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period. Moreover, since the comparison is made through the use or application of the excess profits credit computed on the basis of the constructive average base period net income, the petitioner must prove or establish a constructive average base period net income sufficient to produce an excess profits credit greater than that already computed without the benefit of section 722. *R. W. Eldridge Co.*, 19 T. C. 792 (1953). This, petitioner has failed to do.

Petitioner has requested as an ultimate finding a constructive average base period net income of $496,665 for each of the years under review. Petitioner has, however, furnished us with little persuasive explanation of how this figure can be computed.

Petitioner constructed its average base period net income by substituting the average earnings of the Port Arthur sulphuric acid plant and the Texarkana sulphur-refining plant during the years 1922 through 1930 for their average earnings during the base period years. Petitioner then added the average base period earnings of the Beaumont and Shreveport plants, plus miscellaneous income, and subtracted certain deductions and adjustments, yielding a sum of $336,665. To this sum petitioner added $90,000 because of the construction of the Houston sulphur plant in 1939, $60,000 because of the acquisition of the Arkansas Fertilizer Division just prior to the beginning of the base period, and $10,000 because of the erection of the Shreveport muriatic acid plant in 1938. The resulting total was $496,665.

We have already determined that petitioner has not shown that its decreased earnings during the base period years were due to a temporary economic event as required by section 722 (b) (2). We have also determined that the advent of the sulphuric acid alkylation process for the refining of 100-octane gasoline was not a business change within the meaning of section 722 (b) (4). Furthermore, petitioner does not contend, and has introduced no evidence to show, that the earnings of the Texarkana sulphur-grinding and -refining

plant during the base period years were not an adequate standard of normal earnings. Therefore, we are of the opinion that petitioner has not demonstrated the average base period net income of the Port Arthur and Texarkana plants to be an inadequate standard of normal earnings for those installations. The substitution of the average earnings of these plants during the years 1922 through 1930 for their average earnings during the base period years cannot be sustained.

Petitioner's assertion that the erection of the Houston sulphur-grinding and -refining plant justifies the inclusion of $90,000 in the constructive average base period net income is founded upon the advantages the new plant offered, such as reduced freight rates to the Rio Grande Valley and access to an export market, and also upon the ground that petitioner's former president expected to recover a 30 or 40 per cent gross return on the investment in the Houston plant.

The facts show that although petitioner enjoyed increased profits due to the newly acquired access to an export market and reduced freight rates to the Rio Grande Valley, justifying adjustment to the average base period net income, such increases do not justify an adjustment totaling $90,000 or any amount sufficient to afford petitioner any relief. This would also have been equally true had the plant been placed in operation in 1937 rather than 1939. Furthermore, though petitioner may have anticipated a 30 or 40 per cent return upon its investment in the Houston plant, such anticipation is no support for petitioner's contentions when, in fact, far less was realized. The establishment of an ultimate fact requires something more than a mere statement of the conclusion of the fact sought to be proved. *Pabst Air Conditioning Corporation*, 14 T. C. 427 (1950).

The inclusion of $60,000 in the constructive average base period net income because of the acquisition of the Arkansas Fertilizer Division was apparently premised upon the fact that the volume of sales of the Fertilizer Division doubled and operating profits multiplied during the second year after the close of the base period.

Section 722 (a) states, *inter alia:*

In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayer generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earning to be used as the constructive average base period net income.

Petitioner does not fall within the noted exceptions. Therefore, the sharp expansion of the sales and earnings of the Fertilizer Division

2 years after the close of the base period is no support for the inclusion of $60,000 in petitioner's constructive average base period net income.

When petitioner entered the fertilizer business at North Little Rock it had the benefit of established brand names for its product and an experienced manager at the helm. Excluding an unexplained $12,521.05 credit in the trucking and miscellaneous expense account for the fiscal year ending March 31, 1940, the operating profit of the Arkansas Fertilizer Division was greater in the fiscal year ending March 31, 1937, than in any of the fiscal years 1938, 1939, 1940, or 1941. In the fiscal years 1937 through 1941 the Fertilizer Division had sales as follows: 1937, 16,538 tons; 1938, 16,572 tons; 1939, 14,274 tons; 1940, 17,342 tons; 1941, 17,638 tons. During the calendar years 1936 through 1940 the amount of fertilizer consumed in the State of Arkansas increased from 48,931 tons to 101,000 tons.

The picture these facts paint is not that of an expanding business but that of an enterprise operating throughout the base period years at a mature level in relation to a peacetime economy. Nor is it evident from the facts that profits would have been greater during the base period years had the petitioner entered the fertilizer business at North Little Rock 2 years before it actually did. We must conclude that petitioner has not shown the average base period net income of the Arkansas Fertilizer Division to be an inadequate standard of normal earnings for the purpose of computing an excess profits credit and that petitioner incorrectly added $60,000 to its constructive average base period net income.

The inclusion by petitioner of $10,000 in the constructive average base period net income to adjust for the erection of the Shreveport muriatic acid plant is predicated upon application of the push-back rule.

The Shreveport muriatic acid plant commenced operation in April 1938. During the first year of operation the plant sustained a loss of $17,333.05. During the second year, the fiscal year ending March 31, 1940, the loss was $1,734.11. However, viewed from December 31, 1939, we are unable to assume that had the muriatic acid plant been placed in operation in 1936 rather than in 1938 petitioner's profits in the last year of the base period would have been $10,000 greater than they actually were. Therefore, on the present record the inclusion by petitioner of $10,000 or any lesser sum in the constructive average base period net income because of the erection of the muriatic acid plant is unjustifiable.

In final analysis, the petitioner has shown only one factor which justifies any adjustment of the average base period net income—the construction of the Houston sulphur plant in 1939. After consider-

ing all factors relative to the erection and operation of this plant, including the new export market and favorable freight rates available to the new plant, and after applying the push-back rule, we are still unable to construct an average base period net income which would yield an excess profits credit greater than the credits available to petitioner under the invested capital method. We must therefore sustain respondent's disallowance of petitioner's claims.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

